## HEWITT v. EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 26, 1925.)

No. 4380.

**1. Insurance ⬅=448—Insurance company not absolved from liability on policy because beneficiary murdered insured.**

An insurance company is not absolved from liability on its policy because the beneficiary murdered the insured.

**2. Insurance ⬅=448—Insurance company absolved from liability under policy, where beneficiary procured issuance thereof with intent to murder insured and defraud company.**

An insurance company is absolved from liability on policy, where beneficiary procures and obtains the insurance with the intent to murder the insured, and thus cheat and defraud the insurer.

**3. Insurance ⬅=668(11)—Court erred in directing verdict for insurer on ground that beneficiary had obtained policy with intent to murder insured and defraud company.**

In suit on insurance policy, where defense was that beneficiary had obtained insurance with intent to murder insured and defraud insurer, held, that it was error to direct verdict for defendant on ground that receipt, delivery, and acceptance of policy was act not of insured, but of beneficiary, in view of evidence showing beneficiary's mental condition to be unbalanced.

**4. Courts ⬅=343—Practice authorized by state statute as to action at law in state courts prevails in an action of law removed to federal court.**

Practice as to intervention authorized by state statute as to action at law in state courts prevails in an action of law removed to federal court.

**5. Action ⬅=36—Courts ⬅=356—Action on insurance policy did not become one in equity because of intervention by insured's administrator, or by defendant's answer alleging fraud in procuring insurance; directed verdict not sustainable as finding of fact by chancellor on conflicting evidence.**

Action on insurance policy by guardian of beneficiary was not changed from one at law to one in equity, governed by equity rule 75–B, requiring record of testimony to be presented in narrative form, by the fact that executor of insured intervened, under Rem. Comp. Stat. Wash. § 202, to claim proceeds on ground that beneficiary, by murdering insured, had forfeited right to proceeds, and defendant in answer alleged fraud in procuring of insurance; hence, where trial court directed verdict for insurer, insurance company's contention that record showed finding of fact by chancellor on conflicting testimony was not sustainable.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Edward E. Cushman, Judge.

Action by the guardian of Ruth Plumlee against the Equitable Life Assurance Society of the United States, wherein G. C. Hewitt, administrator of the estate of Hugh C. Plumlee, deceased, intervenes. From a judgment for defendant, intervener brings error. Reversed and remanded.

On March 29, 1922, Ruth Plumlee, then the wife of Hugh C. Plumlee, paid to the defendant in error the premiums on two policies of life insurance on the life of her husband, in which she was made the beneficiary and received the policies. About five hours later she murdered her husband by poison. Thereafter her guardian, alleging that she was insane, brought an action in a state court to recover upon the policies. The defendant in error answered, denying liability under the policies, and on the ground of diversity of citizenship it removed the cause to the court below. The administrator of the estate of Hugh C. Plumlee, deceased, then intervened by the permission of the court, and in his complaint alleged that Ruth Plumlee, by her act in murdering her husband, had forfeited her right as beneficiary under the terms of the policies; that she willfully and unlawfully murdered her said husband, and thereafter had pleaded guilty to the charge of murder, and had been sentenced to life imprisonment; and that by reason of that fact the administrator was entitled to recover the fruits and benefits of the policies, under the terms thereof. The defendant in error, answering the intervener's complaint, alleged that at the time when Ruth Plumlee paid the premiums and received the policies she intended to take the life of her husband, and that her said acts were done as part of her plan to defraud the defendant in error, and that thereby the latter had been induced to deliver the policies. The defendant in error prayed that the contracts of insurance be canceled on the ground of said fraud and deceit. Upon the issues joined between the intervener and the defendant in error, the cause came on for trial before a jury, and at the close of the testimony the court instructed the jury to return a verdict for the defendant in error.

Stratton & Kane, Elmer W. Leader, and Alfred J. Schweppe, all of Seattle, Wash., for plaintiff in error.

Alexander & Greene, Kerr, McCord & Ivey, and Wm. Z. Kerr, all of Seattle, Wash., for defendant in error.

Before GILBERT, RUDKIN, and McCAMANT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] It is well settled that an insurance company is not absolved from liability on its policy because the beneficiary murders the insured. Cleaver v. Mutual Reserve Fund Life Ass'n, 1 C. D. 147; Supreme Lodge, K. L. H., v. Menkhausen, 209 Ill. 277, 70 N. E. 567, 65 L. R. A. 508, 101 Am. St. Rep. 239; Slocum v. Metropolitan Life Ins. Co., 245 Mass. 565, 159 N. E. 816, 27 A. L. R. 1517; Schmidt v. Northern Life Ass'n, 112 Iowa, 41, 83 N. W. 800, 51 L. R. A. 141, 84 Am. St. Rep. 323; Welch v. Travelers' Ins. Co. (Sup.) 178 N. Y. S. 748; New York Life Ins. Co. v. Davis, 96 Va. 737, 32 S. E. 475, 44 L. R. A. 305; Sharpless v. Grand Lodge, A. O. U. W., 135 Minn. 33, 159 N. W. 1086, L. R. A. 1917B, 670.

[2] In the case last cited the court said: "Public policy may not permit the murderer to profit by a recovery on the policy; but it does not excuse the insurer from paying to those who would take in the absence of a beneficiary. The rule of public policy is invoked to prevent the murderer from profiting—not to relieve the insurer from paying." But an insurance company is absolved from liability in a case where the beneficiary himself procures and obtains the insurance with the intent to murder the insured, and thus cheat and defraud the insurer. New York Mut. Life Ins. Co. v. Armstrong, 117 U. S. 591, 6 S. Ct. 877, 29 L. Ed. 997.

[3] The crucial question here is whether or not it was error to direct the jury to return a verdict for the defendant on the ground that the evidence showed that the "receipt, delivery, and acceptance" of the policies was not the act of the insured, but was the act of the beneficiary. The evidence was that the applications for insurance did not originate in the mind of either Plumlee or his wife, but was suggested to them by an agent of the defendant in error, who solicited the insurance, and who on various occasions discussed the matter with them. On February 14, 1922, applications of the husband and wife for the insurance of each for the benefit of the other were accepted by the agent. It was then understood that the quarterly premium on each of the two policies on the husband's life was to be $11.32. Owing to the hazardous nature of his occupation, the company declined to issue the policies at that rate, and on March 6, 1922, it executed at its home office in New York the two policies involved in the present litigation, with premiums fixed at $11.69 per quarter. When these policies were offered

to Plumlee, he was out of employment and had not decided what he was going to do.

On March 28, 1922, an agent of the insurance company visited him at his home and attempted to get him to accept the policies, but he answered that he did not know whether he wanted to accept them, or not. In that conversation he said: "'Well, there is no hurry about this. You have my note. She has got the money.' And he pointed to his wife. 'She can pay you now, if she wants to.'" The agent, when testifying, was asked whether or not Plumlee accepted the policies on the terms written, and he answered: "He did, after we had a little conversation." In answer to the question whether Plumlee made any objection on the ground that the policies were written at a higher rate of premium than expressed in the applications, the agent answered: "He first talked a little bit. He wanted to know why it was. He was a very conservative fellow, and he felt or wanted to know why that he had to pay more than what he expected to have to pay in the first place. We explained to him that it was on account of his hazardous occupation that he had to pay more for it, and he says: 'Well, I expected that, because a fellow that is working in the shipyard has to pay more than in general lines of business anyway.'"

On the following day, when the agent saw Mrs. Plumlee, pursuant to his request that he might discuss the matter with her alone, she informed him that her husband wished the policies, and she then paid him the premiums on the two policies on her husband's life and on the policy on her own life, of which her husband was the beneficiary, and the agent returned to her the notes originally given by her husband for the premiums. An hour later she purchased strychnine, and about an hour thereafter she poisoned her husband. The evidence indicated that it had been Plumlee's practice to turn over his earnings to his wife, and that she had been the disburser of the family funds, and it is clearly inferable that the premiums were paid by her out of such funds. There was evidence, also, that in the evening of the day on which the tragedy occurred Mrs. Plumlee inquired[6] of a neighbor whether any one had ever told her that her husband was leaving her or was going to get a divorce, and that, on being answered in the affirmative, she "went wild" and became hysterical.

In view of all the evidence, we are unable to agree with the court below that the question of fraud and deceit in obtaining the insurance on Plumlee's life was not a question that should have been submitted to the jury, for we think the evidence does not clearly show Ruth Plumlee's motive in committing her criminal act, or that at the time when she paid the premiums and obtained the policies she had formed the intention of taking her husband's life, or that her purpose to do so may not have been developed later, in view of information which would seem to have come to her that her husband was about to leave her and sue for a divorce. Her reckless acts, in openly procuring strychnine and immediately administering it with intent to kill, would seem to be those of one whose mind was distracted by domestic trouble, rather than those of one who was criminally bent upon gain.

[4, 5] The defendant in error moves to dismiss the writ of error on the ground that, by its equitable defense to the complaint and the intervention of the plaintiff in error, the cause became one of equitable cognizance, and the record of the testimony is not presented in narrative form, as required by equity rule 73–B, and is not properly certified or approved. We cannot agree that the nature of the action was changed, either by virtue of the allegations of the answer or by the fact of the intervention. The intervention was permitted under section 202, Remington's Compiled Statutes of Washington, which provides that intervention takes place when a third party is permitted to become a party to an action between other persons "either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or demanding anything adversely to both the plaintiff and the defendant."

The practice so authorized by statute as to actions at law in state courts prevails in an action at law removed to a federal court. Bowen v. Needles Nat. Bank (C. C.) 76 F. 176; Cowley v. Northern Pacific Railroad Co., 159 U. S. 569, 16 S. Ct. 127, 40 L. Ed. 263; Cole v. Ralph, 252 U. S. 286, 40 S. Ct. 321, 64 L. Ed. 567. In the case last cited the court said: "In view of the liberal provisions of the local statute, Rev. Laws 1912, §§ 4998–5000, we think the court did not err in allowing him to come in as a plaintiff." Nor do the allegations of the answer change the nature of the action. The defense of fraud in procuring the policy was as available on the trial of the case as a law action as it would have been in a suit in equity.

It follows that the contention of the defendant that the record here shows a find-

ing of fact of a chancellor upon conflicting testimony is not sustainable. Even if the remarks of the trial court on instructing the jury to return a verdict for the defendant in error are to be deemed an expression of the court's conclusion as to the probative effect of the testimony, there is no warrant for regarding them as findings of fact in an equity suit and decisive of the issues involved.

The judgment is reversed, and the cause is remanded for a new trial.